1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROBERT HUGH COLE, | ) | No. C 10-1476 LHK (PR) |
| Plaintiff, | ) | ORDER GRANTING |
| vs. | ) | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| MATTHEW CATE, et al., | ) | |
| Defendants. | ) | |

Plaintiff, proceeding *pro se*, filed an amended civil rights complaint ("AC") pursuant to

42 U.S.C. § 1983 against prison officials at Pelican Bay State Prison ("PBSP"). Plaintiff alleges

that Defendants were deliberately indifferent to his serious medical needs in violation of the

Eighth Amendment. Plaintiff also raises several related state law claims. The Court ordered

service upon named Defendants, and exercised its supplemental jurisdiction over Plaintiff's

related state law claims.

Defendants have moved for summary judgment. Plaintiff has filed an opposition, and

Defendants have filed a reply. Plaintiff has also filed a "brief in opposition" as well as a

declaration.[1] Having carefully considered the papers submitted, the Court hereby GRANTS

Defendants' motion for summary judgment, for the reasons set out below.

---

[1] Plaintiff filed a handwritten declaration with exhibits on September 16, 2011. (Dkt. No. 73.) Plaintiff also filed a typewritten declaration without exhibits on October 24, 2011. (Dkt. No. 79.) A comparison of both declarations shows that they are substantively the same.

**BACKGROUND**

Plaintiff filed this action, alleging that Defendants were deliberately indifferent to his serious medical needs.  He is a sixty-year old prisoner who claims that he suffered from gastroesophaegeal reflux disease ("GERD"), joint, bone, and back pain.  Plaintiff contends that Defendants interfered with previously prescribed treatment for those conditions, delayed and denied adequate medical treatment in order to lower medical expenses, and failed to diagnose and treat his conditions.  In response, Defendants argue that they provided all treatment that was medically necessary, and that Plaintiff's allegations amount to no more than a difference of opinion.

The following facts are viewed in the light most favorable to Plaintiff, and are undisputed unless otherwise indicated.

In 2000, while Plaintiff was at PBSP, he was prescribed a pain reliever for his chronic back pain, and Almacone, a chewable antacid, to treat his chronic heartburn.  (AC at ¶ 11.)  In 2002, Plaintiff began having increasingly more severe pain in his limbs, joints, and back, and he was prescribed 500 milligrams of calcium.  (*Id.* at ¶¶ 12-13.)  He was also diagnosed with mild GERD.  (Decl. Plaintiff, Ex. C.)  From 2003 through 2006, Plaintiff continued to receive the above medications, and his pain and discomfort appeared to subside.  (AC at ¶¶ 15-17.)  In 2006, Plaintiff began to experience pain in his limbs, joints, and back again, and Dr. Rowe increased his calcium prescription to 1000 milligrams.  (*Id.* at ¶ 17.)  On June 20, 2006, an x-ray of Plaintiff's spine showed that he had mild to moderate arthritic changes in all disk spaces, except for the L1-L2 space level, which showed moderate to severe arthritic changes.  (Decl. Plaintiff, Ex. L.)  On June 23, 2006, Plaintiff's calcium level was within normal range.  (Decl. Risenhoover at ¶ 7; Decl. Sayre at ¶ 8.)

In October 2007, Nurse Practitioner ("NP") Sue Risenhoover became Plaintiff's primary care provider ("PCP").  (AC at  ¶ 18.)  Plaintiff requested a renewal of his Tylenol, calcium, and Almacone prescriptions.  (*Id.* at ¶ 19.)  On October 30, 2007, NP Risenhoover saw Plaintiff and told him that she would not renew his calcium prescription, and that she was reducing his Almacone prescription from 200 tablets to 15 tablets per month.  (*Id.* at ¶ 20.)  Plaintiff

attempted to dissuade her, urging her to check his medical history to confirm that he had been diagnosed with acid reflux disease in 2002, and that the calcium helped to diminish his limb, joint, and bone pain.  (*Id.* at ¶ 22.)  NP Risenhoover stated that she did not see this evidence on her computer, and told Plaintiff that she "did not have time" to check Plaintiff's medical records, nor did she care about Plaintiff's medical history.  (*Id.* at ¶ 24.)  She further indicated that she was complying with Sacramento's instructions to her to cut medications in order to lower costs.  (*Id.*)  She did, however, renew his Tylenol prescription.  (Decl. Maiorino at AGO-026.)

On November 21, 2007, NP Risenhoover prescribed Sucralfate to Plantiff.  (Decl. Plaintiff, Ex. D.)  Sucralfate is used to treat reflux disease by coating the esophagus and stomach, and reduces inflammation, swelling, and discomfort.  (Decl. Risenhoover at ¶ 9.)  However, Sucralfate had no positive effect on Plaintiff's condition, and Risenhoover was not receptive to Plaintiff's complaints.  (AC at ¶ 26; Decl. Plaintiff at ¶ 13.)  NP Risenhoover also ordered an upper gastrointestinal ("UGI") exam, as well as an x-ray.  (Decl. Plaintiff, Ex. D.)  She discontinued the Almacone, but renewed the Tylenol prescription.  (Decl. Maiorino at AGO-025.)

On December 20, 2007, Plaintiff filed an administrative appeal ("602") complaining that he was not receiving adequate treatment for his heartburn.  His appeal was denied at the first level.  (AC at ¶¶ 27-28; Decl. Plaintiff, Ex. E.)  In response to Plaintiff's appeal, however, on January 31, 2008, NP Risenhoover gave Plaintiff a prescription of 15 tablets of Almacone every two weeks, re-prescribed Tylenol, and added new prescriptions of Prilosec, and Ranitidine.  (AC at ¶ 29; Decl. Plaintiff, Ex. F.))  Prilosec helps to prevent the production of acid in the stomach, and eliminates swelling or inflammation in the esophagus and stomach.  (Decl. Risenhoover at ¶ 9.)  Ranitidine is an antihistamine prescribed to reduce stomach acid production, and is commonly used to treat peptic ulcer disease and GERD.  (Decl. Williams at ¶ 9; Decl. Risenhoover at ¶ 9.)

In February or March 2008, Plaintiff's bone and joint pain returned and began to increase in severity.  (AC at ¶ 32.)  Plaintiff's pain was so great that it was difficult or impossible to walk, stand, and bathe.  (*Id.* at ¶ 34.)  On February 8, 2008, Plaintiff's calcium level was within normal

1  range, and his Vitamin D serum level was high.  (Decl. Risenhoover at ¶ 7; Decl. Maiorino, Ex.

2  A at AGO-068 – AGO-069.) From March through October 2008, Plaintiff told Risenhoover

3  about his joint and bone pain, but Risenhoover refused to prescribe calcium treatment, or any

4  treatment besides Tylenol for his joint/bone pain.  (AC at ¶ 35.)

5  From January through September 15, 2008, NP Risenhoover prescribed Plaintiff

6  Almacone, Tylenol, and Ranitidine.  (Decl. Maiorino at AGO-008 - AGO-018, AGO-080 -

7  AGO-092.)  Plaintiff indicated that his GERD improved with Ranitidine.  (*Id.*)

8  On June 24, 2008, Plaintiff received the UGI exam and was diagnosed with a small hiatal

9  hernia and active GERD.  (AC at ¶ 31; Decl. Risenhoover at ¶ 10.)  The physician who

10  conducted the exam told Plaintiff that it was a very painful condition.  (AC at ¶ 31.)  However,

11  there were no ulcerations or other abnormalities.  (Decl. Risenhoover at ¶ 10; Decl. Plaintiff, Ex.

12  G.)  The UGI exam revealed nothing remarkable about Plaintiff's abdomen or stomach.  (Decl.

13  Plaintiff, Ex. G.)

14  On September 15, 2008, NP Risenhoover found that Plaintiff's GERD was stable with

15  Ranitidine and Almacone.  (Decl. Maiorino at AGO-007.)  NP Risenhoover renewed both

16  prescriptions, as well as Tylenol.  (*Id.*)

17  In October 2008, NP Risenhoover ordered a Vitamin D test.  (AC at ¶ 36.)  On October

18  29, 2008, Plaintiff filed another 602, complaining of his bone and joint pains, and requesting

19  restoration of his calcium treatment.  (*Id.* at ¶ 37.)  On November 25, 2008, Risenhoover, with

20  the approval of Dr. Sayre, represcribed calcium and Vitamin D, and ordered an extra mattress to

21  be provided to Plaintiff for one year.  (*Id.* at ¶ 38.)  NP Risenhoover told Plaintiff that he would

22  not be referred to an orthopedic specialist because he had no specific orthopedic problem

23  requiring orthopedic care, but informed Plaintiff that he was receiving the extra mattress because

24  he had two crushed discs in his lower spine.  (*Id.* at ¶ 38; Decl. Plaintiff, Ex. K.)  On November

25  26, 2008, an x-ray report comparing results to Plaintiff's June 2006 x-ray report revealed no

26  significant changes, and showed unremarkable sacroiliac joints.  (Decl. Plaintiff, Ex. 1C.)  It

27  further remarked that there were "old traumatic changes involving the L1-L2 level with mild to

28  moderate degenerative disc disease."  (*Id.*)

On January 31, 2009, Plaintiff submitted a 602 at the Director's Level, claiming that he was taking his calcium and Vitamin D, but he was still experiencing significant pain. (Decl. Plaintiff, Ex. O)  Plaintiff insisted that a visit to an orthopedic doctor was warranted. (*Id.*) Because there was no specific orthopedic problem, and Plaintiff's pain medication was consistently renewed, Plaintiff's 602 was denied. (*Id.*)

In January 2009, Dr. Williams became Plaintiff's PCP. (AC at ¶ 42.)  At that time, Plaintiff was receiving calcium, Ranitidine, Almacone, and Tylenol. (Decl. Maiorino at AGO-097.)  Dr. Williams refilled all of Plaintiff's prescriptions the first three times he saw Plaintiff in 2009. (AC at ¶ 43.)

On October 7, 2009, Plaintiff requested a refill of his prescriptions. (*Id.* at ¶ 44.)  Two days later, all medications were renewed except for the Tylenol. (*Id.* at ¶ 45.)  On October 11, 2009, Plaintiff requested the renewal of Tylenol as well as renewal of his extra mattress chrono, which was due to expire. (*Id.* at ¶ 46.)  Plaintiff was then given a memorandum that Dr. Sayre distributed on October 15, 2009, stating that the new policy was that inmates who requested over the counter medication must pay a $ 5.00 co-pay, and wait to see a doctor to have medications renewed. (*Id.* at ¶ 47 and Ex. S.)  At that time, Plaintiff was receiving calcium, Ranitidine, and Almacone, but not Tylenol. (Decl. Plaintiff, Ex. R.)  Outside of receiving a 3-day supply of Tylenol or Motrin on October 28, 2009, and November 25, 2009, Plaintiff did not receive a prescription for Tylenol until December 3, 2009. (AC at 53; Decl. Plaintiff, Ex. W.)

On December 16, 2009, Dr. Williams ordered Salsalate for Plaintiff's pain, and Ranitidine for his GERD. (AC at ¶ 54; Decl. Williams at ¶ 7.)  Dr. Williams discontinued his ibuprofen. (Decl. Plaintiff, Ex. X.)  Salsalate is a non-steroidal anti-inflammatory drug used to reduce pain and inflammation cause by rheumatoid arthritis, osteoarthritis, and related rheumatic conditions. (Decl. Williams at ¶ 9.)  Dr. Williams also ordered a dexa-scan to check Plaintiff's bone density in order to determine if he suffered from osteoporosis. (AC at ¶ 54; Decl. Williams at ¶ 7.)  On December 18, 2009, Plaintiff received medications, but realized that Dr. Williams had not renewed his calcium or Almacone. (AC at ¶ 55.)  Plaintiff's joint and bone pain began to increase again. (*Id.* at ¶ 59.)  On January 28, 2010, Plaintiff requested a refill of calcium.

1   Nurse Williams informed Plaintiff that, because of the budget crisis, they were no longer issuing

2   Almacone.  (*Id.* at ¶ 60.)  Plaintiff acknowledged that the Salsalate was helping with his bone

3   and joint pain, but it made him sleepy.  (Decl. Plaintiff, Ex. Z.)  Plaintiff's dexa-scan was

4   approved, but Plaintiff did not receive any calcium.  (AC at ¶ 60.)  Nurse Williams explained to

5   Plaintiff that the dexa-scan would check his calcium levels, and after they received results, he

6   could talk to his PCP about renewing his calcium pills.  (Decl. Plaintiff, Ex. Z.)

7       On February 17, 2010, Plaintiff again requested the extra mattress chrono, and a renewal

8   of his calcium.  (AC at ¶ 61.)  Both requests were denied.  (*Id.* at ¶ 61.)  Plaintiff finally received

9   his dexa-scan on April 16, 2010, which revealed that Plaintiff had osteopenia, a bone-wasting

10  disease.  (*Id.* at ¶ 64.)  The dexa-scan revealed that Plaintiff was at a low risk of fracture at his

11  spine L2-L4, and a moderate risk of fracture at the femur neck.  (Decl. Plaintiff, Ex. 1A.)

12      On April 29, 2010, Dr. Williams ordered alendronate sodium, calcium, and Vitamin D for

13  Plaintiff.  (Decl. Plaintiff, Ex. 1B.)  Plaintiff was not experiencing any relief.  (AC at ¶ 66.)  On

14  June 15, 2010, Plaintiff saw Dr. Williams, and relayed to him that his pain was worse than ever

15  even though he was taking all his medications.  (AC at ¶ 68.)  Dr. Williams chuckled and said,

16  "I'm sure you'll be okay," but did not otherwise question him about his condition.  (*Id.*)

17      In July 2010, an x-ray report of Plaintiff's lumbar spine and right hip showed progressing

18  degenerative changes at the L1-L2 level as compared to Plaintiff's 2008 x-ray report, increasing

19  his "mild to moderate" degenerative disk disease to "moderate" degenerative disk disease.

20  (Decl. Mairorino, Ex. A at AGO-120.)  Otherwise, there were no changes.  (*Id.*)

21      On August 4, 2010, Dr. Sayre responded to Plaintiff's July 30, 2010 letter in which he

22  requested an appointment with an orthopedic specialist.  (Decl. Plaintiff, Ex. 1N.)  In Dr. Sayre's

23  letter, he informed Plaintiff that an orthopedic consultation was unnecessary because Plaintiff

24  had arthritis in his spine, and mild low calcium content in some of his bones.  (*Id.*)  Plaintiff was

25  receiving the appropriate therapies for both.  (*Id.*)

26      On October 27, 2010, Plaintiff sent in a sick-call slip requesting Dr. Williams re-evaluate

27  his pain medications, and informing Dr. Williams that Plaintiff's arms were always going numb

28  and aching, and Plaintiff had a sharp pain shooting from his buttocks down his leg.  (*Id.* at ¶ 69.)

1    Plaintiff was told he would be put on the doctor's line.  On November 19, 2010, Plaintiff

2    received a prescription of ibuprofen, with no explanation.  (*Id.* at ¶ 71.)  On December 12, 2010,

3    Plaintiff sent in another sick-call request to see the doctor, and was told that Dr. Williams had

4    ordered the ibuprofen, which was appropriate for osteoarthritis, and canceled Plaintiff's

5    appointment.  (*Id.* at ¶ 73.)

6         In March 2011, Dr. Williams retired, and Dr. Adams replaced him.  (Decl. Plaintiff at

7    ¶ 85.)  Plaintiff was diagnosed with carpal tunnel syndrome and L trochanteric bursitis, which

8    was causing him severe pain in his left hip.  (*Id.*)  Plaintiff was given a brace for his carpel tunnel

9    syndrome, and an extra mattress chrono for his back and bursitis.  (*Id.*)  Plaintiff was also given a

10   lidocaine shot for his hip, which improved his walking, and relieved most of his hip pain.  (*Id.*)

11   On June 27, 2011, Dr. Ikegbu became Plaintiff's PCP and changed Plaintiff's pain management

12   plan by putting him on Tylenol #3, which has helped to reduce Plaintiff's pain.  (*Id.* at ¶ 86.)

13                                       **LEGAL STANDARD**

14        Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

15   that there is "no genuine issue as to any material fact and that the moving party is entitled to

16   judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect

17   the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute

18   as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

19   verdict for the nonmoving party.  *Id.*

20        The party moving for summary judgment bears the initial burden of identifying those

21   portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

22   issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Where the moving

23   party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

24   reasonable trier of fact could find other than for the moving party.  But on an issue for which the

25   opposing party will have the burden of proof at trial, the moving party need only point out "that

26   there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

27        Once the moving party meets its initial burden, the nonmoving party must go beyond the

28   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

1  genuine issue for trial." Fed. R. Civ. P. 56(e).  The Court is only concerned with disputes over

2  material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

3  *Anderson,* 477 U.S. at 248.  It is not the task of the Court to scour the record in search of a

4  genuine issue of triable fact.  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The

5  nonmoving party has the burden of identifying, with reasonable particularity, the evidence that

6  precludes summary judgment.  *Id.*  If the nonmoving party fails to make this showing, "the

7  moving party is entitled to judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.

8        A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

9  based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder*

10  *v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified

11  complaint as opposing affidavit where, even though verification not in conformity with 28

12  U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and

13  allegations were not based purely on his belief but on his personal knowledge).  Here, Plaintiff's

14  verified amended complaint and declaration are considered as evidence in opposition to

15  Defendants' motion.

16        The Court's function on a summary judgment motion is not to make credibility

17  determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

18  *Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

19  must be viewed in the light most favorable to the nonmoving party, and the inferences to be

20  drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at

21  631.

22                    **DISCUSSION**

23  A.    Injunctive Relief

24        Defendants argue that Plaintiff's request for injunctive relief is barred by *Plata v.*

25  *Schwarzenegger*, No. C 01-1351 TEH (N.D. Cal. Apr. 5, 2001).  Individual suits for injunctive

26  and equitable relief from alleged unconstitutional prison conditions cannot be brought where

27  there is a pending class action suit involving the same subject matter.  *See McNeil v. Guthrie*,

28  945 F.2d 1163, 1165 (10th Cir. 1991); *Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir.

1   1988) (en banc).  "Individual members of the class and other prisoners may assert any equitable

2   or declaratory claims they have, but they must do so by urging further actions through the class

3   representative and attorney, including contempt proceedings, or by intervention in the class

4   action."  *Id.*   Here, as *Plata* remains pending, Plaintiff must seek compliance with the terms of

5   the settlement agreement through the class representative and attorney.  Accordingly, his claim

6   for injunctive relief must be DISMISSED.

7          However, Plaintiff's claim for damages may proceed.  *See Hiser v. Franklin*, 94 F.3d

8   1287, 1291 (9th Cir. 1996) (holding that class action suit seeking only declaratory and injunctive

9   relief does not bar subsequent individual damage claims by class members, even if based on the

10   same events).  This rule recognizes and respects the reality that compelling every class member

11   to join his or her individual damages claim to the class action would render the action

12   unmanageable.  *See id.* at 1292.

13   B.     Eighth Amendment Claim

14          Deliberate indifference to a prisoner's serious medical needs violates the Eighth

15   Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth

16   Amendment only when two requirements are met: (1) the deprivation alleged is, objectively,

17   sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's

18   health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

19          A "serious" medical need exists if the failure to treat a prisoner's condition could result

20   in further significant injury or the "unnecessary and wanton infliction of pain."  *Id.*  The

21   existence of an injury that a reasonable doctor or patient would find important and worthy of

22   comment or treatment; the presence of a medical condition that significantly affects an

23   individual's daily activities; or the existence of chronic and substantial pain are examples of

24   indications that a prisoner has a "serious" need for medical treatment.  *McGuckin v. Smith*, 974

25   F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v.*

26   *Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

27          A prison official exhibits deliberate indifference when he knows of and disregards a

28   substantial risk of serious harm to inmate health.  *See Farmer*, 511 U.S. at 837.  The official

1  must both know of "facts from which the inference could be drawn" that an excessive risk of

2  harm exists, and he must actually draw that inference. *Id.* "A difference of opinion between a

3  prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

4  claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Where doctors have chosen

5  one course of action and a prisoner-plaintiff contends that they should have chosen another

6  course of action, the plaintiff "must show that the course of treatment the doctors chose was

7  medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose

8  this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v.*

9  *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

10          1.      *GERD*

11          The parties do not dispute that Plaintiff's GERD was a serious medical condition.

12  However, Plaintiff has failed to raise a triable issue of fact that Defendants acted with deliberate

13  indifference.

14          The undisputed evidence shows that Plaintiff received continuous medication for his

15  GERD.  In October 2007, NP Risenhoover decreased Plaintiff's Almacone from 200 pills per

16  month to 15 pills per month.  Less than a month later, Plaintiff was prescribed Sucralfate, and his

17  Almacone was discontinued.  In December 2007, Plaintiff complained via 602 that the Sucralfate

18  was not working.  In January 2008, NP Risenhoover responded to the 602 and re-prescribed 15

19  tablets of Almacone every two weeks, and added Prilosec and Ranitidine.  In March 2008, the

20  Prilosec was discontinued, but Plaintiff continued to receive the Almacone and Ranitidine to

21  treat his GERD.  NP Risenhoover ordered a UGI one month after initially treating Plaintiff in

22  order to determine the extent of Plaintiff's gastrointestinal issues.  She also advised Plaintiff to

23  reduce gastrointestinal discomfort by limiting his strenuous exercise, drinking more water,

24  avoiding spicy foods, and avoiding lying flat immediately after eating.  (Decl. Risenhoover at ¶

25  9.)

26          The evidence does not show or support an inference of deliberate indifference by NP

27  Risenhoover.  That she chose a different course of treatment than that preferred by Plaintiff does

28  not demonstrate that she did so in disregard of a substantial risk of serious harm to Plaintiff.

1    Moreover, Plaintiff does not demonstrate that her treatment plan "was medically unacceptable

2    under the circumstances." *Jackson*, 90 F.3d at 332.  Thus, Defendants are entitled to summary

3    judgment on this claim.

4              2.      *Joint, bone, and back pain*

5          The parties do not dispute that Plaintiff's joint and bone pain is a serious medical

6    condition.  They dispute that Plaintiff's back pain is a serious medical condition.  However, even

7    assuming that Plaintiff had a serious medical need, Plaintiff has failed to raise a triable issue of

8    fact that Defendants acted with deliberate indifference.

9          The undisputed evidence shows that Plaintiff has suffered from pain in his limbs, joints,

10   and bones since 2002.  In 2007, his pain increased.  Plaintiff alleges that the increase in pain

11   resulted from Defendants' discontinuing and/or decreasing his prescription for calcium.  From

12   October 2007 through November 2008, Plaintiff did not receive any calcium medication.  In

13   November 2008, Plaintiff began receiving a prescription for calcium again, which lasted through

14   December 2009.  In December 2009, Plaintiff was prescribed Salsalate, and his prescription for

15   calcium was discontinued.

16         The undisputed evidence shows that in February 2008, Plaintiff's calcium level was

17   within the normal range, and Vitamin D serum level was high.  (Decl. Risenhoover at ¶ 7.)  NP

18   Risenhoover discussed with Plaintiff appropriate foods that he should eat to maintain an

19   appropriate level of calcium.  (*Id.* at ¶ 7.)  Moreover, calcium and Vitamin D levels in the body

20   do not produce any symptoms, and are not perceived by people.  (Decl. Sayre at ¶ 6.)  A

21   prescription for calcium would not have alleviated Plaintiff's pain.  (Decl. Williams at ¶ 6.)  No

22   medical basis exists to link Plaintiff's bone and joint pain to a denial of calcium or other

23   medication.  (Decl. Sayre at ¶ 6.)  In addition, too much calcium may cause negative effects such

24   as kidney disease, lethargy, constipation, stomach nausea, and other conditions.  (Decl.

25   Risenhoover at ¶ 7; Decl. Williams at ¶ 8.)  The undisputed evidence also shows that Dr.

26   Williams prescribed Salsalate for Plaintiff's pain in order to reduce pain and inflammation

27   caused by arthritis and osteoarthritis.  (Decl. Williams at ¶¶ 7, 9.)  Dr. Williams also ordered a

28   dexa-scan to determine whether Plaintiff suffered from osteoporosis.  (*Id.* at ¶ 7.)  The result

1   confirmed that Plaintiff did not have osteoporosis, and revealed that Plaintiff's bone-density was

2   normal, although he showed signs of osteopenia.  (*Id.*)  In January 2010, Plaintiff acknowledged

3   that the Salsalate was helping to relieve his bone and joint pain.

4          Plaintiff provides no non-conclusory evidence that the lack of calcium medication

5   contributed to his pain, or that he was harmed by Defendants' failure to prescribe him calcium

6   from October 2007 through November 2008.  *See McGuckin*, 974 F.2d at 1060.  Further,

7   Plaintiff points to no competent evidence that Defendants knew that the lack of calcium

8   medication presented a serious risk of harm to Plaintiff, or that Defendants were aware of a risk

9   that Plaintiff was suffering from not having a calcium prescription.  *See, e.g.*, *Toguchi v. Chung*,

10  391 F.3d 1051, 1058-60 (9th Cir. 2004) (summary judgment in favor of defendant doctor

11  appropriate where evidence showed doctor did not believe that Cogentin use presented a serious

12  risk of harm to plaintiff, and where there was no indication in the record that doctor was aware

13  of a risk that plaintiff was suffering from Klonopin withdrawal).

14         Further, regarding Plaintiff's back pain, Plaintiff's 2008 x-ray showed no fractures,

15  dislocations, or scoliosis, and revealed no inflammation or swelling in his spine.  (Decl.

16  Risenhoover at ¶ 8.)  NP Risenhoover determined that there was no need to refer Plaintiff to an

17  orthopedic specialist because there was no orthopedic problem.  (*Id.*)  Because the x-ray result

18  also indicated that there should be no correlating pain for Plaintiff, there was no medical reason

19  to require stronger pain medication than ibuprofen or Tylenol.  (*Id.*)  In addition, Plaintiff's

20  medical records demonstrate that he has had back pain since 1985 from a basketball injury.

21  (Decl. Sayre at ¶ 12.)  His x-rays show an "old traumatic degenerative joint disease" at the

22  L1-L2 vertebrae.  (*Id.*)  This type of injury is more consistent with a trauma than with a

23  widespread joint disease.  (*Id.*)  Plaintiff's degenerative joint disease is slowly progressing,

24  which is to be expected in a sixty-year old man.  (*Id.* at ¶ 13.)  In Dr. Sayre's medical opinion,

25  there is no therapy that is necessary, or can change Plaintiff's condition.  (*Id.*)  The only

26  treatments that have a positive impact on this type of pain is "general exercise, stretching,

27  occasional OTC analgesics such as Tylenol or ibuprofen, and infrequent muscle relaxants for

28  short bursts."  (Decl. Sayre at ¶ 14.)  Plaintiff does not dispute that he has been receiving these

1    treatments.

2          The undisputed evidence does not show or support a reasonable inference of deliberate

3    indifference by Defendants in their treatment of Plaintiff's bone, joint, and back pain.  Plaintiff

4    was provided with treatment in the form of Salsalate, Tylenol, ibuprofen, and general advice

5    regarding decreasing his pain.  Defendants performed x-rays, bloodwork, and a dexa-scan to

6    better determine the cause of Plaintiff's complaints.  Although Plaintiff preferred a different

7    treatment, his personal preference is not the measure for a federal constitutional violation.

8    Plaintiff has not presented any competent evidence that calcium medication and/or an orthopedic

9    specialist were the only medically acceptable treatment options for his bone, joint, and back

10   pain.  At most, he has shown a difference of opinion about the proper care for his complaints,

11   and that does not amount to deliberate indifference.  Plaintiff fails to raise a triable issue of fact

12   that Defendants' chosen course of action was medically unacceptable under the circumstances,

13   and chosen in conscious disregard of an excessive risk to his health.

14          3.     *Budgetary concerns*

15          Plaintiff alleges that Dr. Williams's supervisors, Sayre and McLean, told Dr. Williams

16   that he was prescribing too many medications in comparison to other CDCR doctors and ordered

17   him to reduce the number of renewals in order to reduce cost.  Plaintiff also alleges that NP

18   Risenhoover told him that "Sacramento" instructed her to reduce medications to reduce costs.

19   Finally, Plaintiff alleges that Dr. Sayre created these policies that reduced medical care, and

20   caused Plaintiff to suffer harm.

21          There is no doubt that the failure to provide treatment because of a tight budget can

22   amount to deliberate indifference.  *See Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986).

23   Here, however, Defendants did not fail to treat Plaintiff.  Moreover, while budgetary constraints

24   may have partially motivated Defendants' actions, they did not ultimately prevent Plaintiff from

25   receiving treatment that was medically acceptable under the circumstances.

26          Plaintiff attempts to show deliberate indifference by providing a memorandum from Dr.

27   Sayre to his medical staff that "no common, minor, or uncomfortable issues should be addressed.

28   . . . Move on to essential care."  (Decl. Plaintiff, Ex. P.)  Dr. Sayre further instructed, "give only

1    the most essential constitutional care." (*Id.*)  While the memorandum is certainly blunt, without

2    more, it does not raise a triable issue of fact that Dr. Sayre acted with deliberate indifference.

3            Plaintiff further attempts to support his claim that Defendants provided inadequate

4    medical care with a memorandum from Dr. Sayre requiring a $5.00 copay for over-the-counter

5    medications.  However, requiring a copayment does not necessarily equate to deliberate

6    indifference.  "If a prisoner is able to pay for medical care, requiring such payment is not

7    deliberate indifference to serious medical needs."  *Reynolds v. Wagner*, 128 F.3d 166, 173-74

8    (3d Cir. 1997).  More importantly, Plaintiff submits no evidence that he was refused any

9    medicines because he was unable to pay.

10           4.      *Supervisory liability*

11           Liability may be imposed on an individual defendant under 42 U.S.C. § 1983 only if the

12   plaintiff can show that the defendant proximately caused the deprivation of a federally protected

13   right.  *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).  "A person deprives another 'of a

14   constitutional right within the meaning of section 1983 if he does an affirmative act, participates

15   in another's affirmative act or omits to perform an act which he is legally required to do, that

16   causes the deprivation of which [] the plaintiff complains []'".  *Leer*, 844 F.2d at 633 (internal

17   citations omitted).  To defeat summary judgment, plaintiff must "set forth specific facts as to

18   each individual defendant's" actions which violated his rights.  *Id.* at 634.  Even at the pleading

19   stage, "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was

20   personally involved in the deprivation of his civil rights."  *Barren v. Harrington*, 152 F.3d 1193,

21   1194 (9th Cir. 1998).

22           Plaintiff sues Dr. Sayre in his supervisorial capacity as Chief Medical Officer of PBSP.

23   Specifically, Plaintiff alleges that Dr. Sayre was aware of the reduced medical care at PBSP, and

24   created policies to reduce such care.  However, the Court has not found that either of Dr. Sayre's

25   subordinates, NP Risenhoover or Dr. Williams, was deliberately indifferent to Plaintiff's medical

26   needs, or violated any of his constitutional rights.  Accordingly, Dr. Sayre is entitled to summary

27   judgment as a matter of law.

28           Plaintiff alleges that Jacquez and Cate were aware of the deficiencies in the prison's

1    medical system, and were responsible for the care of the inmates, yet failed to correct the issues.

2    Absent vicarious liability, each Government official, his or her title notwithstanding, is only

3    liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (finding

4    under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and Rule 8 of the Federal Rules of

5    Civil Procedure, that complainant-detainee in a *Bivens* action failed to plead sufficient facts

6    "plausibly showing" that top federal officials "purposely adopted a policy of classifying post-

7    September-11 detainees as 'of high interest' because of their race, religion, or national origin"

8    over more likely and non-discriminatory explanations).  Although Plaintiff has made allegations

9    regarding the medical care he has received in prison, there is no allegation that Jacquez or Cate

10   was involved in any way in determining Plaintiff's medical care, nor did they cause the alleged

11   violations.  Thus, there is no genuine issue of material fact as to Plaintiff's claims against

12   Jacquez and Cate.  As such, the Court grants Defendants' motion for summary judgment as to

13   Jacquez and Cate.

14        Plaintiff alleges that McLean and Walker denied his administrative appeals regarding his

15   medical claims.  (Decl. Plaintiff, Exs. N, O, Y, 1E.)  A prison official is deliberately indifferent if

16   he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by

17   failing to take reasonable steps to abate it.  *Farmer*, 511 U.S. at 837.  Here, the undisputed

18   evidence demonstrates that McLean and Walker reasonably responded to Plaintiff's medical

19   requests by ensuring that thorough investigations of plaintiff's condition and care were

20   conducted at the second and third levels of review and, based on the facts revealed by such

21   investigations, reasonably determined Plaintiff did not require other care in addition to, or

22   instead of, that which he was receiving.  As the evidence does not raise a triable issue as to

23   Plaintiff's claims that McLean and Walker acted with deliberate indifference to Plaintiff's

24   serious medical needs, summary judgment will be granted in favor of each such Defendant.

25   B.      Qualified Immunity

26        Defendants claim, in the alternative, that qualified immunity would protect them from

27   liability on Plaintiff's deliberate indifference claim.

28        The defense of qualified immunity protects "government officials . . . from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). A defendant may have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Saucier*, 533 U.S. at 205. The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Where there is no clearly established law that certain conduct constitutes a constitutional violation, the defendant cannot be on notice that such conduct is unlawful. *See Rodis v. City & County of San Francisco*, 558 F.3d 964, 970-71 (9th Cir. 2009). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable defendant that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202.

On these facts, viewed in the light most favorable to Plaintiff, Defendants prevail as a matter of law on his qualified immunity defense because the record establishes no Eighth Amendment violation. However, even if a constitutional violation had occurred with respect to Plaintiff's claim of deliberate indifference to his serious medical needs, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed their conduct was lawful. *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049-50 (9th Cir. 2002).

Defendants do not dispute that Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly established during the period within which the injuries complained of occurred. Given the circumstances, however, Defendants' actions were reasonably calculated to treat Plaintiff's condition. Based on the evidence available to

1   Defendants, their actions were reasonable and appropriately tailored to Plaintiff's condition and

2   symptoms.  Although Plaintiff's joint, bone, and back pain have not been fully relieved, Dr.

3   Sayre indicated that Plaintiff's bone and back pain are common, especially in people at

4   Plaintiff's age, and that the appropriate treatment was moderate pain medication, which Plaintiff

5   was receiving.  Further, Plaintiff's GERD was consistently treated.  In hindsight, a different

6   approach may have spared Plaintiff some of the pain he experienced, but there is no indication

7   that Defendants' actions and methods of treatment were unreasonable.  That Plaintiff's treatment

8   under Dr. Adams and Dr. Ikegbu appears to have provided Plaintiff with more effective relief

9   does not necessitate a finding that Defendants' treatment was not medically acceptable or

10   reasonable.  "[P]rison officials who act reasonably cannot be found liable under the Cruel and

11   Unusual Punishments Clause."  *Farmer*, 511 U.S. at 845 (1994).  A reasonable person in

12   Defendants' situation could have believed that their actions did not violate Plaintiff's clearly

13   established constitutional rights.

14          Accordingly, Defendants are entitled to qualified immunity, and their motion for

15   summary judgment is GRANTED on that ground as well.

16   C.     <u>State law claims</u>

17          Because the parties are not diverse, the Court's jurisdiction over the instant action is

18   based on Plaintiff's federal claims.  To the extent the Court has jurisdiction over the state law

19   claims, such jurisdiction is supplemental in nature.  *See* 28 U.S.C. § 1367(a).

20          A district court may decline to exercise supplemental jurisdiction where "the district

21   court has dismissed all claims over which it has original jurisdiction."  *See* 28 U.S.C.

22   § 1367(c)(3).  Where a district court has granted summary judgment on the sole federal claims,

23   the district court, pursuant to § 1367(c)(3), may properly decline to exercise supplemental

24   jurisdiction over the remaining state law claims.  *See Bryant v. Adventist Health System/West*,

25   289 F.3d 1162, 1169 (9th Cir. 2002).  Here, having considered the matter, and in light of the

26   resolution of the federal claim, the Court finds it appropriate to decline to exercise jurisdiction

27   over Plaintiff's state law claims, pursuant to § 1367(c)(3).

28          This dismissal is without prejudice.  Plaintiff may pursue his state law claims in state

1  court. *See Reynolds v. County of San Diego*, 84 F.3d 1162, 1171 (9th Cir. 1996) (dismissal of

2  pendent state claims following dismissal of federal claims must be without prejudice), *rev'd on*

3  *other grounds by Acri v. Varian Associates, Inc.*, 114 F.3d 999 (9th Cir. 1997).

4                                                **CONCLUSION**

5        Defendants' motion for summary judgment is GRANTED.  Judgment shall be entered in

6  favor of Defendants.  The Clerk shall terminate all pending motions and close the file.

7        IT IS SO ORDERED.

8  DATED: ___1/24/12___

                                                LUCY H. KOH
9                                               United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28